IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LASALLE BANK NATIONAL )
ASSOCIATION, AS TRUSTEE UNDER )
TRUST AGREEMENT DATED JUNE 2, )
1997 AND KNOWN AS TRUST NUMBER )
121054 and MUSA TADROS, ) No. 05 C 7089
 )
 )
 Plaintiffs, )
 )
v. )
 )
MORAN FOODS, INC. d/b/a SAVE-A- )
LOT, LTD., )
 )
 Defendant. )
 )

## MEMORANDUM OPINION AND ORDER

Plaintiffs LaSalle Bank National Association, as Trustee Under Trust Agreement Dated June 2, 1997 and Known As Trust Number 121054 ("Trustee") and Musa Tadros, filed a three count complaint against defendant Moran Foods, Inc. d/b/a Save-A-Lot, Ltd. ("SAL") seeking a declaratory judgment and damages for breach of a lease agreement and tortious interference. Defendant has filed a two count counterclaim against plaintiffs for breach of the lease agreement. Both parties have moved for summary judgment. Plaintiffs have moved for summary judgment on Count II of the counterclaim. Defendant has moved for summary judgment on all claims and counterclaims. For the following reasons, I grant defendant's motion for summary judgment on the complaint and Count I of the counterclaim, and deny defendant's motion for summary judgment on Count II the counterclaim. Plaintiffs' motion for summary judgment

on Count II of the counterclaim is also denied.

I.

This case centers on a lease agreement ("Lease") entered into by the parties on or around April 26, 2002. Trustee is the legal title holder of a shopping center located at 3939 West Ogden Avenue in Chicago, Illinois ("Shopping Center"). Tadros is the beneficiary of the LaSalle Trust and owner of the Shopping Center. SAL is a discount grocery store and plaintiffs' tenant at the Shopping Center. The Lease provides that the property consists of approximately 14,935 square feet, and includes all appurtenances and rights to the "Common Facilities." (Lease § 1.1.) The Common Facilities are defined as

> [t]he sidewalks, driveways, landscaping, parking areas, services areas, including loading and unloading facilities, utilities to the point where they enter a building, Shopping Center signs, and other facilities of the Shopping Center designed for use by all occupants of the Shopping Center, including all easements, accesses or other rights benefit[t]ing the Shopping Center (even if not located on the Shopping Center) . . . .

(Lease § 4.2.)

The events that set forth this dispute are as follows. First, Tadros entered into negotiations with a currency exchange (an existing tenant at the Shopping Center) and a T-Mobile store for the construction of a separate building on a lot on the northwest corner of the Shopping Center ("the Outlot"). Tadros claims he obtained SAL's approval for construction from Robert Gilbert and Nick Ardagna. Gilbert was a real estate development manager for

2

SAL (Def. Exh. G at 6) and Ardagna is a division manager. (Def. Exh. T at 4-5.) SAL disputes that Tadros obtained any such approval and furthermore that Gilbert and Ardagna were ever authorized to give any purported approval on behalf of SAL. On October 1, 2004, Tadros signed a lease with T-Mobile.

Second, in June or July of 2004, construction began on a gas station on a separate lot ("Lot 41") on the northeast corner of the Shopping Center, across from the Outlot. Lot 41 is not part of the Shopping Center and borders the Common Facilities. Construction lasted for approximately two months. In the fall of 2004, gas pumps were installed at the gas station. SAL claims the gas pumps impacted visibility, parking and access to the SAL store. SAL also claims sales declined during the construction period and continued to decline subsequent to the completion of construction of the gas station.

SAL commissioned a survey of the Shopping Center to determine the extent of an encroachment by the gasoline pumps and canopy onto the Common Facilities. The survey is dated September 20, 2006. According the survey, the gasoline pumps fall approximately 16 feet onto the Common Facilities and the canopy falls approximately 29.5 feet onto the Common Facilities. Plaintiffs deny that the canopy is on the Common Facilities, but admit it "overhangs a portion of the common area." (Pl. Resp. SOF. at § 67.) On November 8, 2004, SAL wrote Tadros stating that the gas pump installation was in

3

violation of the Lease and that SAL objected to such construction. (Def. SOF at § 70.) On November 30, 2004, Tadros sent SAL a letter stating that the "gas pump happens to fall approximately five feet into the common area." (Def. SOF at § 71.)

II.

Summary judgment is only appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgement as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp*, 165 F.3d 1087, 1090 (7th Cir. 1999); Fed. R. Civ. P. 56(c). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). I do not make "credibility determinations, weigh the evidence, or decide which inferences to draw from the facts." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment should be denied. *Anderson*, 477 U.S. at 248.

A. The Complaint

1. Counts I-II.

Defendant first argues summary judgment is appropriate on Counts I and II of the complaint in light of the language of section 4.2 of the Lease, which provides SAL a right to prohibit construction. Both counts allege SAL's refusal to consent to the

4

construction of a building on the Outlot was unreasonable and in bad faith. Count I seeks a declaratory judgment and Count II seeks damages for breach of contract. Specifically, SAL argues section 4.2 is unambiguous and, therefore, there can be no implied duty of good faith and fair dealing.

"[U]nder Illinois law, the covenant of good faith and fair dealing has never been an independent source of duties for the parties to a contract." *Beraha, M.D., v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992); *see also Echo, Inc. v. Whitson Co., Inc.*, 121 F.3d 1099, 1106 (7th Cir. 1997); *McDonald's Corp. v. C.B. Mgmt. Co., Inc.*, 13 F.Supp. 2d 705, 711 (N.D. Ill. 1998) (Moran, J.). Rather, it is a cannon of construction applied to the explicit terms in the contract. *Echo*, 121 F.3d at 1106; *McDonald's*, 13 F.Supp. 2d at 711. The covenant is invoked to determine the intent of the parties where a contract is ambiguous and subject to more than one construction. *See Cromeens, Hollowman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003) (citing *Northern Trust Co. v. VIII South Michigan Ass'n*, 276 Ill. App. 3d 355, 657 N.E.2d 1095, 1103 (Ill. App. Ct. 1995)). "A contract is ambiguous only if the language employed is susceptible of different constructions when read in its plain and ordinary meaning." *Id.* (quoting *Althoff Indust., Inc. v. Elgin Med. Ctr., Inc.*, 95 Ill. App. 3d 517, 520-21, 420 N.E.2d 800, 803 (Ill. App. Ct. 1981)). If found applicable, the covenant requires contractual

5

discretion to be exercised reasonably and not arbitrarily and capriciously. *Greer Properties, Inc. v. LaSalle Nat'l Bank*, 874 F.2d 457, 460 (7th Cir. 1989) (citing *Foster Enterprises, Inc. v. Germania Fed. Savings and Loan Ass'n*, 97 Ill. App. 3d 22, 30, 309 N.E.2d 1375, 1381 (Ill. App. Ct. 1981)).

The parties agree that section 4.2 of the Lease, titled "Shopping Center Improvements," states: "Lessor and Lessee agree that Lessee has the absolute right to prohibit Lessor from constructing any buildings in the Shopping Center in any locations other than the building locations shown [on] Exhibit A." Exhibit A to the Lease shows that there were no buildings on the Outlot. The parties do not dispute that the specific language in this provision was actively negotiated and was intended to provide SAL with control over the construction of buildings that would adversely impact site lines, traffic patterns and parking. In contrast, there are three other provisions in the Lease agreement that incorporate reasonableness or good faith requirements. (Lease §§ 4.6, 7.3, 13.1.)

I agree with defendant that the language of section 4.2 is unambiguous, conferring defendant an "absolute right" to prohibit construction. In fact, plaintiffs do not suggest any alternate interpretation. Instead, plaintiffs argue that because section 4.2 confers defendant discretion in prohibiting construction, the covenant is automatically invoked. In support, plaintiffs cite

6

*Greer*, 874 F.2d at 460-61, and *Beraha*, 956 F.2d at 1444-45. Both cases are inapposite here. The contract at issue in *Greer* did not concern "plain" terms, such as the ones present here. 874 F.2d at 458 (the relevant provision stated "Seller further agrees to take all action . . . to bring the soil into compliance . . . and shall use its best efforts to have all such work completed . . . provided, however, that if the cost of such clean-up work will, in Seller's best business judgment, be economically impracticable, the Seller, at its option, may terminate this Contract"). And *Beraha* recognizes that the covenant does not override the reasonable expectations of the parties as expressed in a contract.[1] 956 F.2d at 1445-46 ("employment at-will contract is terminable for any reason"). *Beraha* reaffirmed the principle that "in Illinois the obligation of good faith and fair dealing is not a separate obligation upon which a cause of action may be based." *Id.* at 1444.

Plaintiffs also argue that section 4.2 is tantamount to a restraint on alienation, which must be strictly construed against restriction and has an implied reasonableness requirement. Section 4.2, however, concerns only the initiation of construction on the property, not alienation or the transfer of title. *See Drayson v. Wolff*, 277 Ill. App. 3d 975, 981, 661 N.E.2d 486, 491 (Ill. App.

---

[1] *Baraha* does not sample the contract language at issue in that case.

Ct. 1996) ("The rule against restraints on alienation has developed from the early idea that the power of alienation of real property is socially and economically desirable."). In fact, plaintiffs admit it is a construction regulation provision that is common in retail leases and is designed to protect the tenant's visibility, parking, and signage.[2] (Pl. SOF Resp. at § 27.) In contrast, the cases cited by plaintiff concern restrictions on the transfer or assignment of a property title or interest. *See Golf Mgmt. Co., Inc. v. Evening Tides Waterbeds, Inc.*, 213 Ill. App. 3d 355, 360, 572 N.E.2d 1000, 1003 (Ill. App. Ct. 1991) (citations omitted) ("where a lease forbids any sublease or assignment without the consent of a landlord, the landlord cannot unreasonably withhold his consent to a sublease."); *Jack Frost Sales, Inc. v. Harris Trust and Sav. Bank*, 104 Ill. App. 3d 933, 944, 433, N.E.2d 941, 949 (Ill. App. Ct. 1982) (citations omitted) ("where a lease forbids any sublease or assignment without the consent of the lessor, the lessor cannot unreasonably withhold his consent to a sublease.").

Moreover, the cases cited by plaintiffs to argue that a reasonableness requirement must be implied into section 4.2, by

---

[2] Even assuming *arguendo* that section 4.2 constituted a restraint on alienation, it does not offend public policy. *See Gale v. York Center Cmty. Cooperative, Inc.*, 21 Ill. 2d 86, 92, 171 N.E.2d 30, 33 (Ill. 1961) ("Such a restraint may be sustained . . . when it is reasonably designed to attain or encourage accepted social or economic ends.").

8

virtue of the fact that it regulates the initiation of construction on the property, are inapposite for two reasons. The first, as already discussed, concerns the general applicability of the case law on restrictive covenants. In Illinois, "[r]estrictions on the use of property *conveyed in fee* are not favored." *Sadler v. Creekmur*, 354 Ill. App. 3d 1029, 1036, 821 N.E.2d 340, 346 (Ill. App. Ct. 2005) (emphasis added). This case does not concern a restriction on any type of conveyance or a cloud on title, but on construction on a developed piece of property. Plaintiffs, as the lessors, agreed to condition the initiation of future construction on the property during the ten-year term of the Lease on SAL's approval. This was intended to protect SAL's visibility, parking, and signage, which does not offend public policy. Any burden plaintiffs claim on their ownership as a result of the Lease was their own doing. Under plaintiffs' reasoning, any term or condition on a lease that regulates conduct on the property (such as "no pets") could be read as a restrictive covenant.

Second, like the covenant of good faith and fair dealing, Illinois courts decline to imply additional terms in a contract contrary to the existing explicit terms. "As with any other contract, the terms must be given their ordinary and natural meaning when they are clear and unambiguous." *Sadler*, 354 Ill. App. 3d at 1036, 821 N.E.2d at 347 (examining existence of restrictive covenant). The very case cited by plaintiffs, *Watts v.*

9

*Fritz*, makes this clear. 29 Ill. 2d 517, 194 N.E.2d 276 (Ill. 1963). With respect to the specific restrictions at issue in *Watts*, the court reasoned as follows:

> [I]t is evident that if the developer had so intended he could and would have placed in the deeds a clear and definite covenant or restriction expressly so stating. That he did not do so is practically conceded by both parties to this suit. It would also appear that he could and would expressly have provided that there was to be no splitting or subdividing of the original platted lots if none was to be done. In our opinion, he did not place any such express prohibitions in the deeds.

*Id.* at 522, 194 N.E.2d at 279.

I have already determined section 4.2 is not unclear or ambiguous. The parties here are bound by the terms of the Lease, which provides SAL with an absolute right to prohibit construction on the Outlot for the term of the Lease. The fact that SAL's right under section 4.2 is broad does not mean it is ambiguous. *See, e.g., Cromeens*, 349 F.3d at 395 (provision providing parties the unfettered right to terminate contract was not ambiguous for purposes of invoking covenant of good faith and fair dealing). Accordingly, summary judgment is granted on Counts I and II.

2. Count III

Count III alleges defendant tortiously interfered with plaintiffs' contractual relationship with T-Mobile and prospective economic relationship with the currency exchange. To succeed on a claim for tortious interference with a contract under Illinois law, a plaintiff must show that (1) it had a valid and enforceable

10

contract and that (2) the defendant was aware of the contract and (3) intentionally and unjustifiably induced the other contracting party to breach it, (4) causing the plaintiff damages. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145. 154-55, 545 N.E.2d 672, 675 (Ill. 1989). Similarly, elements of a tortious interference with prospective economic advantage claim are: (1) a reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of plaintiff's expectancy; (3) defendant's purposeful interference to defeat the expectancy; and (4) damages. *Chowdhury v. Marathon Oil Co.*, 949 F.Supp. 1353, 1359 (N.D. Ill. 1997). Moreover, Illinois law dictates that any tortious interference by a defendant, either with a contract or prospective business relationship, must have been directed toward the third party, not the plaintiff. *Douglas Theater Corp. v. Chicago Title & Trust Co.*, 266 Ill. App. 3d 1037, 1047, 641 N.E.2d 584, 590 (Ill. App. Ct. 1994) ("[I]t has been long held that the defendant's interference must be directed toward a third party."); *Ontap Premium Quality Waters, Inc. v. Bank of N. Illinois*, 262 Ill. App. 3d 254, 634 N.E.2d 425 (Ill. App. Ct. 1994) ("Illinois courts require that a tortious interference claim be supported by allegations that the defendant acted toward a third party.").

As defendant points out, there is no evidence in this case that SAL had any contact with T-Mobile or the currency exchange. Therefore, they cannot establish any claim for tortious

interference. Plaintiffs have not bothered to respond to this argument. Accordingly, summary judgment is granted on Count III.

B. Counterclaims

1. Count I

SAL seeks summary judgment on Count I of its counterclaims for breach of contract, arguing Tadros violated section 4.2 of the Lease when he refused to accept SAL's rejection of a building on the Outlot. Tadros is "currently in for permits for this building, and plan[s] to begin construction as soon as the permits are approved." (Pl. SOF Resp. at § 75.) Tadros claims he obtained approval for construction from Gilbert and Ardagna, as apparent agents acting on behalf of SAL. (Pl. SOF Resp. at § 48.)

Agency can arise when an agent has either "actual or apparent" authority to act on the principal's behalf. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000). "Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf." *Id.* at 1065 (quoting *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 218 Ill. App. 3d 383, 577 N.E.2d 1344, 1350 (Ill. App. Ct. 1991)). This doctrine is based on estoppel principles. *Pantoja v. Vill. of Hoffman Estates*, No. 02 C 8124, 2005 WL 372193, at *7 (N.D. Ill. Feb. 15, 2005) (Pallmeyer, J.) (quotations omitted) ("The doctrine is based on the notion that if a principal creates the appearance

that a party is its agent, it will not be permitted to deny the agency if an innocent third party reasonably relied on the apparent agency, and is harmed as a result.").

Plaintiffs cannot establish there is a genuine issue of material fact concerning defendants' approval of the plan for the construction on the Outlot. Plaintiffs point to Tadros' deposition testimony that he had previously approached Gilbert on the construction of a McDonald's restaurant at the Outlot, and was never subsequently instructed to do differently. (Tadros Dep. June 26, 2006, at 93.) He also testified that Gilbert communicated approval of the McDonald's site plan. (Id. at 93-94.) Similarly, Tadros testified he was instructed to approach Ardagna about the construction of a McDonald's on the Outlot. (Id. at 94-95.) Tadros testified he informed Gilbert and Argdana about the T-Mobile store and currency exchange construction plans and they did not express their disapproval. (Id. at 82, 93-95.) However, Tadros also testified that Gilbert never said anything to him about the T-Mobile and currency exchange plans to build on the Outlot, other than the general statement that "anything would be an improvement." (Id. at 106.) Gilbert requested a site plan, which Tadros says he sent. (Id. at 118.) Tadros also explains that he never spoke with Gilbert on the subject again, for next time that he tried to reach Gilbert he was informed that Gilbert had been fired. (Id. at 106, 108.) Tadros also admits that Ardagna never told him SAL had

13

authorized the construction on the Outlot. (Id. at 109.)

In light of the fact that Tadros concedes that he never obtained a response from Gilbert or anyone else after submitting the site plan for approval, plaintiffs cannot establish the existence of an issue of material fact. Plaintiffs argue that because Gilbert had verbally communicated approval of the previous McDonald's site plan to Tadros (id. at 93-96), Tadros reasonably believed that he obtained approval of the proposed construction at issue here through silence. The problem with this argument is that Tadros, unlike with the site plan for the McDonald's, never obtained any kind of response, negative or positive, to the submitted site plan with regards to the proposed construction of the T-Mobile store and currency exchange. Tadros further understood that the site plan may not have been agreeable to Gilbert. (Id. at 119.) When he attempted to communicate with Gilbert again he learned he had been fired. (Id.) There is no evidence on record that Gilbert or Ardagna approved, or even acknowledged, the site plan. Accordingly, I grant summary judgment on Count I of the counterclaim.

2. Count II

The parties have filed cross-motions for summary judgment on Count II. SAL's second counterclaim claims plaintiffs breached sections 4.2, 6.2, and 10.2 of the Lease by allowing gas pumps and a gas canopy to encroach on the Common Facilities, without

14

obtaining SAL's prior written approval. The provisions of the Lease that concern the Common Facilities are sections 6.2 and 10.2. Section 6.2, titled "Use of Common Facilities," states:

> Lessor agrees that (a) it shall not grant any rights with respect to the Common Facilities or permit the use thereof by any persons other than the tenants and occupants of the Shopping Center, their employees and invitees; (b) it shall provide all of the Common Facilities for such use at all times, except during reasonable periods of time required to provide necessary maintenance or repairs; (c) it shall not change the Common Facilities in any manner without the prior written consent of Lessee . . . .

Section 10.2 reads

> Lessor covenants that if the Lessee shall perform all of the covenants and provisions of this Lease to be performed by the Lessee, the Lessee shall peaceably and quietly occupy and enjoy the full possession and use of the Leased Premises and the use of the Common Facilities as herein provided. If at any time Lessor's title shall fail or Lessor is unable to grant rights to the Common Facilities as provided in this Lease, Lessee may at its option cancel this Lease by notice in writing to Lessor.

The parties do not dispute the existence of an encroachment by the gas pumps, which fall approximately 16 feet into the Common Facilities. (Pl. Resp. SOF. at § 67.) Plaintiffs do dispute that the gas station canopy actually encroaches on the Common Facilities, instead arguing it "overhangs a portion of the common area." (Id.) Defendant claims the canopy encroaches approximately 29.5 feet into the Common Facilities. (Id.) Both parties vigorously dispute what damages, if any, SAL has suffered. The parties do not dispute that plaintiffs did not obtain "prior written consent" from SAL for the construction of the gas station.

15

Plaintiffs argue they are entitled to summary judgment because they did not cause or authorize the encroachment. This argument is inconsequential in light of the provisions of the Lease. Sections 6.2 imposes the duty on plaintiffs to preserve the Common Facilities for the "use" of the tenant. Next, plaintiffs argue they are entitled to summary judgment because they do not own Lot 41 on which the gas station is built. In a footnote, plaintiffs explain that the lot was leased to the "Paula Tadros Partnership" (and that Paula Tadros is the wife of Tadros), which in turn subleased the lot to the third-party that built and manages the gas station. This information is not relevant, however, as plaintiffs do not dispute an encroachment on the Common Facilities, with respect to the gas pumps, or the terms of the Lease.

Plaintiffs also argue defendant is not entitled to rescission. First, they argue that any alleged breach of the Lease was not material. "In Illinois, a purely technical and immaterial breach of a contractual obligation will generally be insufficient to warrant contract rescission." *Capri Sun, Inc. v. Beverage Pouch Sys., Inc.*, No. 97 C 1961, 2000 WL 1036016, at *4, (N.D. Ill. Jul. 21, 2000) (Moran, J.). Materiality is a question of fact that is disputed by defendant. *See Sahadi v. Continental Illinois Nat'l Bank and Trust Co. of Chicago*, 706 F.2d 193, 197 (7th Cir. 1983) (decision on materiality of breach unsuited for resolution by summary judgment). According to SAL, the encroachment impeded

access to the Shopping Center. Plaintiffs claim the encroachment is only minor and does not impede access to or use of the Common Facilities. Second, plaintiffs contend that defendant waived its right to rescission under section 10.2 by failing to exercise it promptly after discovering the encroachment. In response, defendant points out that section 13.7 of the Lease states that "the failure of Lessor or Lessee to insist upon strict performance by the other of any of the provisions of this Lease or to exercise any option herein conferred shall not be deemed a waiver or relinquishment for the future of any provision or option." Plaintiffs fail to address this argument. Therefore, plaintiffs' motion for summary judgment on Count II of the counterclaim is denied.

In turn, defendant argues it is entitled to summary judgment on Count II of the counterclaim because plaintiffs concede the existence of some kind of encroachment on the Common Facilities. The elements of a breach of contract claim under Illinois law are "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Vill. of S. Elgin v. Waste Mgmt. of Ill., Inc.*, 348 Ill. App. 3d 929, 810 N.E.2d 658, 669 (Ill. App. Ct. 2004); *see also* 12A Ill. Law and Prac. Contracts § 471 (2006) (to warrant recovery in breach of contract action "there must have been a loss resulting from the breach"). In this

case, plaintiffs do dispute the extent of the encroachment and damages. Defendant agrees that there is a dispute concerning what damages, if any, were suffered by SAL as a result of the encroachment. Accordingly, there are questions of material fact concerning the extent of the encroachment and damages, and summary judgment is not appropriate.

III.

For the foregoing reasons, defendant's motions for summary judgment on the complaint and Count I of the counterclaim are granted; defendant's motion for summary judgment on Count II of counterclaim is denied; plaintiffs' motion for summary judgment on Count II of the counterclaim is also denied.

**ENTER ORDER:**

*Elaine E. Bucklo*
—————————————
**Elaine E. Bucklo**
United States District Judge

Dated: January 12, 2007